Estate of Gabriel Pascal, also known as Gabor Lehel Pascal, deceased, Valerie Pascal, Administratrix c.t.a. v. Commissioner.
Estate of Pascal v. Commissioner
Docket No. 80833.
United States Tax Court
T.C. Memo 1963-336; 1963 Tax Ct. Memo LEXIS 11; 22 T.C.M. (CCH) 1766; T.C.M. (RIA) 63336; December 24, 1963
*11 (1) The fair market value of the rights to produce a musical play and the rights to produce a motion picture based upon said musical play, based upon George Bernard Shaw's play, "Pygmalion," as of the death of decedent, Gabriel Pascal, July 6, 1954, determined. (2) The fair market value of a right to produce a motion picture based upon Shaw's play, "Devil's Disciple," determined. Leslie Handler for the petitioner. William F. Chapman and Lionel Savadove for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined a deficiency in estate tax in the amount of $2,528.96. The issues for decision are: (1) The fair market value of the rights to produce a musical play and the rights to produce a motion picture based upon said musical play, *12 based upon George Bernard Shaw's play, "Pygmalion" as of the date of death of decedent, Gabriel Pascal, July 6, 1954; and (2) The fair market value of a right to produce a motion picture based upon Shaw's play, "Devil's Disciple," as of the same date. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. The Federal Estate Tax Return here involved was timely filed by the Temporary Administrator with the district director of internal revenue, Upper Manhattan District, on April 5, 1956. Gabriel Pascal, also known as Gabor Lehel Pascal, died on July 6, 1954, a resident of the city of New York. The Chase Manhattan Bank, successor by merger of the Chase National Bank of the city of New York, was appointed Temporary Administrator of the Estate of Gabriel Pascal on September 15, 1954. On January 7, 1957, Valerie Pascal was appointed Administratrix, c.t.a., of the Estate of Gabriel Pascal. As of the time of Pascal's death, debts were claimed to be owing by said decedent in an aggregate amount of $301,304.70, plus a claim for $59,500 by one Edmond Pauker. Said debts have been satisfied by total payments in an amount of $118,253.02 made by the Administratrix, *13 c.t.a., except for the above-mentioned claim of Edmond Pauker, which claim has been appealed to the Appellate Division of the Supreme Court of the State of New York. The Temporary Administrator and the Administratrix, c.t.a., have paid sums totaling $219,275.79 as expenses of administration of the estate of this decedent, plus amounts totaling $50,126.55 as of December 31, 1961, paid to Brandt & Brandt Dramatic Dept., Inc. The total assets of this decedent at the date of death, excluding therefrom any value for decedent's rights to produce a musical play and a motion picture based on said musical play, based on George Bernard Shaw's "Pygmalion," and the movie rights to Shaw's "Devil's Disciple," amounted to $34,051.12. On April 30, 1952, an agreement was entered between Gabriel Pascal Enterprises, Ltd., and the Public Trustee, London, England. This agreement provided for the granting of a license to Gabriel Pascal Enterprises, Ltd., to write, prepare and produce a musical based on or adapted from the play "Pygmalion" and/or a film scenario owned or controlled by Gabriel Pascal, which scenario had been written by and under the supervision of Gabriel Pascal and was based upon or *14 adapted from George Bernard Shaw's play "Pygmalion." The license was granted for a five-year term. The consideration given for this agreement was a guarantee of three percent of the gross box office receipts of all stage presentations, and three percent of gross sums paid for or on account of any motion picture rights based on the said musical. By terms of the agreement, Gabriel Pascal Enterprises, Ltd., agreed to pay to the Public Trustee 3,570 pounds as an advance. Said payment was made. If the musical was not presented on the speaking stage by April 28, 1954, an additional 1,785 pounds could be paid to the Public Trustee and the terms of the agreement would be extended for another two-year period. In the event the musical was not presented on the speaking stage on or before the expiration of the period, as it might be extended, the Public Trustee was to retain the payments made by Gabriel Pascal Enterprises, Ltd., namely, 5,355 pounds, as liquidated damages. On May 6, 1952, the agreement of April 30, 1952, was assigned by Gabriel Pascal Enterprises, Ltd., to Gabriel Pascal. At the time of decedent's death, the agreement of April 30, 1952, as subsequently modified, was in full *15 force and effect, and the time for production of the musical play had been extended to April 28, 1956. On July 20, 1953, Gabriel Pascal entered into an agreement with the Public Trustee, London, England, wherein the former was given an option to purchase a license for all motion picture rights in and to George Bernard Shaw's play, "Devil's Disciple." Shaw was a prominent English dramatist and one of the outstanding playwrights of the Twentieth Century. He died on November 2, 1950, leaving a will which was proved in England on March 20, 1951, and under which the Public Trustee (of the Public Trustee's Office of the County of London) is sole Executor & Trustee. Prior to Shaw's death, he had granted no rights to produce motion pictures of his plays to anyone but the decedent, and would not grant such rights to anyone but decedent. Prior to his death, the decedent had produced four motion pictures of Shaw's plays "Major Barbara," "Androcles and the Lion," "Caesar & Cleopatra," and "Pygmalion." Prior to the death of decedent, the only musical play produced and adapted from any of Shaw's plays was the "Chocolate Soldier" based on Shaw's "Arms and the Man," which musical play was *16 very successful. It had not been produced by Pascal. In or about 1937 decedent had produced a motion picture based on Shaw's "Pygmalion" which was first shown in London and thereafter in the United States. It had repeated runs thereafter. Said motion picture was a financial success, having first played at the Astor Theatre in New York City on a continuous run basis with five performances per day for over 20 weeks and was an artistic success, having received an "Oscar" and the "Academy Award" in 1938. The screen play and dialogue to the script of the motion picture of "Pygmalion" were duly registered and copyrighted in the office of the Register of Copyrights in the Library of Congress by Metro-Goldwyn Mayer (Loew's Incorporated) on March 2, 1939, as CL Entry #8676; and assigned by Loew's Incorporated to Pascal Film Productions, Ltd., by assignment dated February 23, 1949, recorded in the Copyright Records of Assignments in Vol. 697, Page 125 on February 25, 1949; and thereafter assigned by Pascal Film Productions, Ltd., to the decedent by assignment dated December 12, 1952, and recorded in said Copyright Office Records of Assignments in Vol. 869, Page 186 on February 26, 1953, and *17 were owned or controlled by decedent at the date of his death. The last assignment to decedent recorded in Vol. 869, Page 186 included "all renewals and extensions of said copyrights" plus the right to further renewals or extensions, and "any rights of any kind and character whatsoever contained in said motion picture of 'Pygmalion' whether or not then known, recognized or contemplated." The motion picture script and dialogue changed Shaw's play, "Pygmalion," in at least three ways which were significant in the later making of the musical drama based on the play. These changes were: (a) A build-up of the situation in Liza's enunciating, "The rain in Spain stays mainly in the plain." (b) The ballroom scene at the end of the first half. (c) The sentimental implication in the relationship between Higgins and the girl at the end of the play. A Penguin Edition of Shaw's play, "Pygmalion," copyrighted originally in 1916, renewed in 1944, additional material copyrighted in 1942 by George Bernard Shaw, was revised principally by the addition of the ballroom scene referred to above. Prior to his death, decedent was a motion picture producer and director, principally known as such *18 in Europe. He had never produced a play on Broadway. Subsequent to decedent's death, a musical version of "Pygmalion" was produced under the title of "My Fair Lady." Prior to his death, there were negotiations either by decedent or on his behalf with several producers concerning the coproduction of a musical version of "Pygmalion." However, no agreements were entered into. No agreement had been entered into with Rex Harrison, who later starred as the male lead in the musical, as of July 6, 1954. Pascal entered into no agreements with Lerner and Loewe, lyricist and composer, regarding the "Pygmalion" rights. No lyricists or composers had been hired by him to produce a musical prior to his death. Pascal made demands and prescribed conditions in connection with his efforts to dispose of his rights in "Pygmalion" that others were unwilling to accept. He had consummated no negotiations for the production of a musical play prior to his death. At the time in question, the average range in price for an option to produce a musical or play was from $1,000 to $5,000, plus a percentage of proceeds. The cost of producing a musical in 1954, including the option, was about $300,000. The Federal *19 estate tax return filed by petitioner's predecessor, the Chase Manhattan Bank, reported the value of decedent's rights with respect to both "Pygmalion" and "Devil's Disciple" as "undetermined". * In his deficiency notice of March 13, 1959, the respondent adjusted the gross estate, in these respects, by assigning a value of $200,000 and $30,000, respectively, to those rights. [1]
The fair market value of decedent's option to produce a musical play based on George Bernard Shaw's play, "Pygmalion" as of July 6, 1954, including any motion picture or other subsidiary rights, was $200,000. The fair market value of decedent's option to produce a motion picture based upon Shaw's play, "Devil's Disciple," as of July 6, 1954, was $30,000. Opinion The great success, artistic and financial, of the musical "My Fair Lady" *20 based upon George Bernard Shaw's play, "Pygmalion," is a matter of theater history. It is the value of whatever rights to produce such a musical (together with film and other rights) were possessed by Gabriel Pascal at his death that we must determine as of that date. Likewise, while little evidence of record or argument has been directed to the issue, we must determine the value of decedent's rights to produce a film based upon Shaw's play, "Devil's Disciple." Sec. 811, Internal Revenue Code of 1939. With respect to both valuations, we have made ultimate findings of fact which accord with the determinations of respondent in his deficiency notice. It is our conclusion that, despite a voluminous record of expert opinion testimony, petitioner has failed to establish that the respondent's determinations are erroneous. [2]
*21 Prior to his death, Pascal had done nothing which would have prevented his rights from lapsing. Thus, we are not concerned with the valuation of a musical drama in production. At the trial, petitioner offered the opinion evidence of several experts. In each case, the opinion of value presented was based in large part upon facts which occurred subsequent to the critical date. July 6, 1954. The following question placed by petitioner's counsel to one expert was typical in this respect: Q. Mr. Van Nostrand, I am going to ask you a hypothetical question, and I am going to ask you to listen carefully to the question and then give me an answer as to whether you can place a valuation on the properties which are going to be set forth in this question. I want you to assume, Mr. Van Nostrand, that Mr. Pascal, at the time of his death on July 6th, 1954, owned or controlled a film scenario and dialogue written under his supervision and based upon the original play entitled "Pygmalion" by George Bernard Shaw, which motion picture was produced in London in 1938 ** and had a financially and artistically successful run both in England and, in 1938, in the United States, and that it won an Academy *22 Award in 1938, and assume that Mr. Pascal owned the copyright to the motion picture dialogue at the time of his death; and further, I want you to assume that on April 10th, 1952 Mr. Pascal, or one of his corporations, received an exclusive agreement from the Public Trustee of the estate of George Bernard Shaw in consideration of a down payment of some fifteen thousand dollars, which gave him the exclusive world-wide rights to produce a musical stage production of "Pygmalion," to be exercised at any time before April 30th, 1956; and, together with it, the right to produce a musical motion picture based upon the stage musical play, and together with it all incidental and subsidiary rights arising therefrom, such as television, radio, amateur stock rights and record album rights; and I want you further to assume that at the time of Mr. Pascal's death on July 6th, 1954, he had been negotiating then, or prior thereto, with various lyricists or composers and producers for the exploitation of such rights and for the production of a stage musical, and that several outstanding people in show business were interested in these rights; and I want you to assume that after his death the Chase Manhattan *23 Bank, as temporary administrator of his estate, negotiated with producers and others for the sale and transfer of these rights, and on May 23, 1955 entered into an agreement with Frederick Loewe, Alan J. Lerner and Herman Levin whereby the rights of the estate were transferred to them and they agreed to make a musical version of the play, which was subsequently produced by the Liza Company under the name of "My Fair Lady," and that Columbia Broadcasting System paid $360,000 for a forty-percent interest in the profits of the production company; and that the play "My Fair Lady" opened in New York and had its first showing on March 15th, 1956 and became a financial and artistic success and ran for a period of over five years in New York, and it has been running in London - and is still running in London - for over three years, and has run and is still running throughout the United States on a road company basis; and I want you to assume that on the basis of one percent of the gross box office receipts of the stage play the estate of Gabriel Pascal has collected approximately $550,000 from all sources, and has collected approximately $50,000 for its percentage of the record album sales; *24 and I want you to assume that, in addition to the stage play, the motion picture rights for the motion picture version of the stage play were sold in January, 1962 to Warner Brothers for a guaranteed minimum of $5,500,000, payable in four equal installments, together with forty-seven-and-a-half percent of the distributor's gross over twenty million dollars of motion picture receipts; and that the petitioner, the estate herein, is entitled to receive, under the contract with Lerner, Lowe and Levin dated May 23rd, 1955, sixteen percent of the motion picture proceeds, or a guaranteed minimum of at least $880,000, in addition to the above amount of $600,000 which has been collected to date from the stage play and record albums; and I want you to consider further the possibility of proceeds to be realized from world-wide stage productions and the percentage of motion picture receipts over twenty million dollars and all other commercial rights. I ask you whether you can give the Court an opinion, considering all these facts, of the fair market value of the rights to "Pygmalion" under the contract of April *25 30th, 1952, as of July 6th, 1954. The post-death facts were not offered as corroboratory of opinions otherwise based upon facts known or reasonably to be foreseen as of the date of death. They were not offered as evidence of the reasonableness of opinions which necessarily would have to involve considerable foresight as of July 6, 1954. On the contrary, the various circumstances occurring after the critical date were an integral part of the very facts upon which each expert based his opinion. When two of these witnesses were asked questions on cross-examination which sought to elicit an expert opinion as to value without consideration of the post-death facts, one testified to a value of $400,000 and the other to a value of $100,000 plus a percentage of the profits accruing after recoupment of that sum. With respect to the $400,000 value, the witness failed, upon interrogation, to establish any real basis for his opinion. Indeed, here again, it is not at all clear that he did not take into account post-death facts. Whatever weight is to be attached to his opinion in this respect, it is insufficient to overcome the presumption of correctness of the respondent's determination. *26 There is little doubt that Pascal possessed, in the "Pygmalion" rights, something of more than just ordinary value. He held the copyright to the movie script; the play had qualities which experts considered made it readily adaptable for the musical stage. We do not know the basis by which respondent arrived at his valuation. He may have taken these circumstances into account; there is certainly no evidence to the contrary. Moreover, despite any elements of special value in the rights possessed by Pascal, he had not undertaken the essential step of producing a show. He had nothing in production, and the record includes evidence that in 1954 it would have cost in the neighborhood of $300,000 to mount a musical production. On this record, not only has petitioner failed to establish that the respondent's determination is erroneous, but there is also no showing whatsoever that the respondent's determination was either arbitrary or unreasonable. While the above statements are addressed primarily to the "Pygmalion" issue and the parties have considered the "Devil's Disciple" issue only in passing, our conclusions are the same as to the latter issue. Decision will be entered under Rule *27 50. Footnotes
*. By Tax Court order dated 1/24/64, this sentence was substituted for the original first sentence of this paragraph.↩
1. The original petition claimed $800,000 and $180,000, respectively, as the value of decedent's rights with respect to "Pygmallon" and "Devil's Disciple." These values were changed by an amended petition to $1,140,000 and $153,400, respectively. ↩
2. As indicated above, we are confronted here with the unusual circumstance of a petitioner seeking a redetermination which would result in an increase of the deficiency. Apparently, there are questions of basis involved which will affect matters not before the Court. We have not enlarged in this opinion upon this unusual element of the case since the questions raised by the petition which are here at issue are disposed of, in any event, by the failure of petitioner's proof.↩
**. By Tax Court order dated 1/24/64, the year 1938 was substituted for 1948.↩